UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
N'DAMA MIANKANZE BAMBA,

                        Plaintiff,

        -against-                        MEMORANDUM & ORDER
                                         15-CV-1340(JS)(AKT)
KIMBERLY FENTON and STONY BROOK
UNIVERSITY HOSPITAL,

                        Defendants.
----------------------------------------x
APPEARANCES
For Plaintiff:          N'Dama Miankanze Bamba, pro se
                        3600 Rosedale Road
                        Baltimore, MD 21215

For Defendants:         Ralph Pernick, Esq.
                        Christina H. Bedell, Esq.
                        New York State Attorney General
                        200 Old Country Road, Suite 240
                        Mineola, NY 11501


SEYBERT, District Judge:

        Plaintiff N'Dama Miankanze Bamba ("Plaintiff" or "Dr.

Bamba") commenced this action against Kimberly Fenton ("Dr.

Fenton") and Stony Brook University Hospital ("SBUH" and,

collectively, "Defendants") asserting claims pursuant to Title VII

of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981

("Section 1981").[1]   Presently pending before the Court are

Defendants' motion for summary judgment (Defs.' Mot., Docket Entry

---

[1] Plaintiff has expressly represented that she is not asserting any claims
pursuant to 42 U.S.C. § 1983 ("Section 1983") and she is only asserting
claims pursuant to Title VII and Section 1981.  (Pl.'s Opp. Br., Docket Entry
117, at 7.)  As addressed more fully infra, Plaintiff's purported Section
1981 claim must be construed as a Section 1983 claim.

109) and Plaintiff's motion for summary judgment (Pl.'s Mot.,
Docket Entry 114).  For the following reasons, Defendants' motion
is GRANTED and Plaintiff's motion is DENIED.

BACKGROUND[2]

Plaintiff, an African-American woman, was employed at
SBUH as an Assistant Clinical Instructor/Resident Physician for
the Combined Internal Medicine/Pediatrics Residency Program (the
"Meds Peds Program") from July 2011 through August 2013.  (Pl.'s
56.1 Stmt. ¶¶ 1-2.)  The Meds Peds Program Directors considered

---

[2] The following facts are drawn from the parties' 56.1 Statements.  All
disputes have been noted and all internal quotation marks and citations have
been omitted.  References to the record are as follows: Defendants' Rule 56.1
Statement, ("Defs.' 56.1 Stmt.," Docket Entry 103-1); Plaintiff's Rule 56.1
Statement, ("Pl.'s 56.1 Stmt.," Docket Entry 103-2); Defendants' Rule 56.1
Counterstatement, ("Defs.' 56.1 Counterstmt," Docket Entry 103-3);
Plaintiff's Rule 56.1 Counterstatement, ("Pl.'s 56.1 Counterstmt.," Docket
Entry 103-4); Defendants' Memorandum in Support of Summary Judgment, ("Defs.'
Br.," Docket Entry 109-1); Plaintiff's Memorandum in Support of Summary
Judgment, ("Pl.'s Br.," Docket Entry 114-1); Defendants' Memorandum in
Opposition, ("Defs.' Opp. Br.," Docket Entry 115); Plaintiff's Memorandum in
Opposition, ("Pl.'s Opp. Br.," Docket Entry 117 at 2-34); Defendants'
Memorandum in Reply, ("Defs.' Reply Br.," Docket Entry 118); Dr. Fenton's
Deposition Transcript ("Fenton's Dep. Tr.," Docket Entry 114-11); Jean
Segall's Deposition Transcript ("Segall's Dep. Tr., Docket Entry 110);
Plaintiff's EEOC Complaint dated May 17, 2013 ("2013 EEOC Compl.," Docket
Entry 109-17, at P:5-916-P:5-919); Plaintiff's EEOC Complaint dated
October 15, 2014 ("2014 EEOC Compl.," Docket Entry 109-17, at P:5-899-P:5-
906); N.Y. State Physician's Board Complaint ("NYSPB Compl.," Docket Entry
109-17, at P:5-920); EEOC Memorandum ("EEOC Memo," Docket Entry 109-17, at
P:5-910 to 5-913); Letter to EEOC dated October 15, 2014, ("Oct. 2014 EEOC
Ltr.," Docket Entry 109-21); Right to Sue Letter dated November 20, 2013
("2013 Right to Sue Ltr., Docket Entry 109-17); Notice of Charge dated
June 13, 2013 ("2013 Notice of Charge, Docket Entry 109-17, at P:5-914); ABP
letter dated April 21, 2014 ("ABP Ltr.," Docket Entry 109-15, at P:5-94);
Termination Letter dated June 20, 2013 ("Termination Ltr.," Docket Entry 109-
17 at P:5-896); Evaluation for January 1, 2013, to June 30, 2013 ("Kranz
Eval.," Docket Entry 109-15, at P:5-17 to P:5-19); Maryland Board of
Physicians Verification of Postgraduate Medical Education ("Maryland Ver.
Form, Docket Entry 109-15, at P:5-109 to 5-111); Letter dated October 8,
2014 ("Oct. 2014 Ltr.," Docket Entry 109-21, at BAMBA-734); Emails between
Plaintiff and Mr. Djuricich ("Djuricich Emails," Docket Entry 114-7, at P:5-
1047 to 5-1048.); Email from Dr. Blair to Jean Segall ("Blair Email," Docket
Entry 109-18, at BAMBA-1.).

Plaintiff's evaluations for the 2011-2012 period to be "very good to excellent." (Pl.'s 56.1 Stmt. ¶ 6.) Plaintiff expected to complete her residency training on or about June 30, 2015. (Pl.'s 56.1 Stmt. ¶ 24.)

I.  Dr. Fenton

Plaintiff alleges that Dr. Fenton reported to the Accreditation Council for Graduate Medical Education ("ACGME")[3] as the Program Director of the Meds Peds Program. (Pl.'s 56.1 Stmt. ¶ 3.) However, Defendants allege that Dr. Fenton is Co-Director of the Meds Peds Program and "was listed as the administrative director solely to satisfy ACGME requirements, which require a single director for contact and information transmission purposes." (Defs.' 56.1 Counterstmt. ¶ 3.) Dr. Fenton also served as Chair of the Meds Peds Program Review Committee during 2012 through 2013. (Pl.'s 56.1 Stmt. ¶ 7.)

Plaintiff alleges that pursuant to ACGME policy and "Stony Brook GME[4] policy," the program director has discretion with respect to promotion and disciplinary measures for resident physicians. (Pl.'s 56.1 Stmt. ¶ 5.) Defendants aver that "[p]romotion, advancement and assessing competencies of residents

---

[3] The parties agree that "ACGME governs and accredits residency training programs across the United States." (Pl.'s 56.1 Stmt. ¶ 4; Defs.' 56.1 Counterstmt. ¶ 4.)

[4] GME is an abbreviation for "Graduate Medical Education." (Pl.'s Br. at iii.)

are determined by a Resident Oversight Committee, not solely upon the discretion of the program director." (Defs.' 56.1 Counterstmt. ¶ 5.)

## II. Letters of Warning and Probation

In March 2012, Plaintiff completed an ACGME survey and an in-house survey. (Defs.' 56.1 Stmt. ¶ 40.) Defendants allege that these surveys were anonymous. (Defs.' 56.1 Stmt. ¶ 40.) Plaintiff alleges that the ACGME provides that their evaluations are "confidential NOT anonymous," and Dr. Fenton told Plaintiff and other resident physicians that their comments on these surveys could be identified. (Pl.'s 56.1 Counterstmt. ¶ 40.)

On August 6, 2012, SBUH issued Plaintiff a Letter of Warning based on "recurrent episodes of tardiness, and more recently, unexcused absenteeism" (the "Letter of Warning"). (Defs.' 56.1 Stmt. ¶ 17.) Plaintiff alleges that the Letter of Warning was issued by Dr. Fenton and former Co-Program Director Dr. Reilly. (Pl.'s 56.1 Counterstmt. ¶ 17.) Particularly, the Letter of Warning indicated that Plaintiff was absent from or late to an elective and continuity clinics, and missed a mandatory event. (Defs.' 56.1 Stmt. ¶ 18.) Plaintiff disputes these allegations and alleges, among other things, that she obtained approval to miss her elective. (Pl.'s 56.1 Stmt. ¶ 18.)

Defendants allege that the "Letter of Warning contained specific suggestions for improvement and the time frame within

4

which [Plaintiff] was required to do so." (Defs.' 56.1 Stmt. ¶ 20.) Plaintiff disputes this allegation and avers that the letter does not contain a timeframe; however, Plaintiff concedes that the letter states "[y]ou must comply with the following measures . . . [y]ou MUST have no further episodes of unexcused tardiness or absenteeism and must attend all mandatory conferences as outlined in your schedule. In addition, you will maintain current and complete medical records[.]" (Pl.'s 56.1 Counterstmt. ¶ 20.) Plaintiff alleges that while SBUH requires that resident physicians with substandard performance be provided with an "Explicit Remediation Plan," she was not provided with any such plan. (Pl.'s 56.1 Counterstmt. ¶ 21.)

Defendants allege that Plaintiff was late on three occasions during September 2012; however, Plaintiff disputes that allegation. (Defs.' 56.1 Stmt. ¶¶ 23-24; Pl.'s 56.1 Counterstmt. ¶ 24.) On October 4, 2012, Plaintiff was placed on probation. (Defs.' 56.1 Stmt. ¶ 25.) Defendants allege that Plaintiff was placed on probation for violating the Letter of Warning's directive that she not have any additional episodes of tardiness or absenteeism. (Defs.' 56.1 Stmt. ¶ 25.) Plaintiff disputes that she was placed on probation for these deficiencies and alleges that her placement on probation "coincided with an e-mail the Plaintiff sent to Dr. Fenton and Co-Director Dr. Reilly about

inconsistencies in the Training Program's evaluation process."
(Pl.'s 56.1 Counterstmt. ¶ 25.)

III.   <u>Second Probation</u>

In January 2013, Plaintiff was placed in good standing, which Plaintiff alleges indicates that she did not "have any deficiency in ACGME Core Competency and was no longer on a Letter of Probation or Letter of Warning." (Defs.' 56.1 Stmt. ¶ 26; Pl.'s 56.1 Counterstmt. ¶ 26.)  On January 28, 2013, SBUH provided Plaintiff with an offer of appointment to Third-Year Residency Level Training in the Med Peds Program for July 1, 2013 through June 30, 2014.  (Pl.'s 56.1 Stmt. ¶ 9.)  Defendants allege that on January 31, 2013, Plaintiff submitted a grant even though she was told not to do so without her mentor's approval.  (Defs.' 56.1 Stmt. ¶ 27.)  Plaintiff alleges that Dr. Fenton "was aware of the initial preparation, planning and submission of Plaintiff's American Academy of Pediatrics (AAP) Resident CATCH Grant." (Pl.'s 56.1 Stmt. ¶ 11.)

On or about March 14, 2013, Plaintiff was given supervisory privileges for pediatric clinical rotations and continued to possess supervisory privileges for internal medicine clinical rotations.  (Pl.'s 56.1 Stmt. ¶ 12.)  On May 2, 2013, Plaintiff was placed on probation for a second time.  (Defs.' 56.1 Stmt. ¶ 28.)  Defendants allege that "deficiencies were noted with her performance in professionalism, patient care, medical

knowledge, interpersonal and communication skills, [and] practice based learning," and Plaintiff's unprofessionalism "related to unexcused absences, tardiness, [ ] overdue dictation . . . [and] unprofessional behavior with regard to a scholarly project grant submission." (Defs.' 56.1 Stmt. ¶¶ 28-29.) Plaintiff alleges that the timing of her second placement on probation coincided with her completion of an ACGME survey. (Pl.'s 56.1 Counterstmt. ¶ 28.) Plaintiff notes that she was considered to be in good standing as of January 2013, and Dr. Fenton decided not to give her a Letter of Warning or Letter of Probation in February 2013, when she became aware of the issues regarding Plaintiff's grant. (Pl.'s 56.1 Counterstmt. ¶¶ 26-27.)

Plaintiff also received an "On the Fly Evaluation" and SBUH notified her that she possessed "deficienc[ies] with critically assessing an evolving situation and relying on assessments from other personnel[,] . . . does not recognize the limits of her knowledge which puts patients at risk . . . [and] there has been patient dissatisfaction [due to] an overconfident demeanor displayed in front of patients/families, without adequate information." (Defs.' 56.1 Stmt. ¶ 30 (first alteration in original).) Plaintiff's supervisory privileges were revoked on May 2, 2013. (Pl.'s 56.1 Stmt. ¶ 14; Defs.' 56.1 Counterstmt. ¶ 14.) However, Plaintiff alleges that she "received a series of positive evaluation[s] from May 2013 to August 2013." (Pl.'s 56.1

Counterstmt. ¶ 32.)  Additionally, on June 1, 2013, Plaintiff was reappointed to Third Year Resident in the Meds Peds Program for July 2013 through June 2014.  (Pl.'s 56.1 Stmt. ¶ 15.)

IV.  <u>Plaintiff's Termination</u>

On June 13, 2013, Dr. Fenton rescheduled her semi-annual Program Director's Meeting with Plaintiff and restricted Plaintiff's clinical responsibilities in the Pediatrics Emergency Department.  (Pl.'s 56.1 Stmt. ¶ 18.)  On June 17, 2013, Dr. Kimberly Kranz updated an evaluation "suggesting the Plaintiff's performance rating is Unsatisfactory in all six (6) ACGME Core Competencies measures."  (Pl.'s 56.1 Stmt. ¶ 19.)  Dr. Kranz released her evaluation on July 1, 2013.  (Pl.'s 56.1 Stmt. ¶ 19.)

On June 20, 2013, Plaintiff received a letter from SBUH stating that she would be terminated effective August 31, 2013 (the "Termination Letter").  (Defs.' 56.1 Stmt. ¶ 33.)  Defendants allege that the decision to terminate Plaintiff was made after the Medical Pediatrics Review Committee "reviewed the concerns and evaluations of the Plaintiff, and [determined] that [P]laintiff had failed to meet the requirements of remediation."  (Defs.' 56.1 Stmt. ¶ 37.)  Plaintiff alleges that there are many "inconsistencies in the evaluation process the Defendants allege they utilized to evaluate the Plaintiff during her employment at the SBUH Training Program."  (Pl.'s 56.1 Counterstmt. ¶ 37.)

The Termination Letter states that the Medical Pediatrics Review Committee recommended that Plaintiff "not receive credit for the 2012-2013 academic year by the American Board of Pediatrics and the American Board of Internal Medicine." (Defs.' 56.1 Stmt. ¶ 34.) Plaintiff "disputes who specifically made the recommendation to the American Board of Pediatrics," and alleges that ten months later, Dr. Fenton recommended that Plaintiff not receive credit for the 2012-2013 academic year. (Pl.'s 56.1 Counterstmt. ¶ 34.)

SBUH GME Policy sets forth the following procedure for terminating a resident physician: (1) the Program Director or Chair provides notice of termination, (2) the Chair of the Graduate Medical Education Council ("GMEC")[5] reviews the decision and issues a written determination, (3) if the resident physician objects to the Chair of the GMEC's decision, an ad hoc committee is formed to determine whether the resident physician should be terminated, and (4) the ad hoc committee forwards its recommendations to the Chair of the GMEC, and the Chair convenes a meeting to review the ad hoc committee report and render a final determination. (Pl.'s 56.1 Stmt. ¶ 21.)

On or about June 26, 2013, Plaintiff submitted an appeal of her termination to Dr. Schiavone, Vice Dean for Medical

---

[5] Defendants define the GMEC as the Graduate Medical Education Committee. (Defs.' 56.1 Stmt. ¶ 38.)

Education and Chair of the GMEC Grievance Procedures. (Pl.'s 56.1 Stmt. ¶ 22; Defs.' 56.1 Stmt. ¶ 38.) On July 1, 2013, Dr. Schiavone informed Plaintiff that an ad hoc committee would be formed to review her termination. (Pl.'s 56.1 Stmt. ¶ 23.) The Ad Hoc Appeals Committee conducted a hearing and recommended to the GMEC that Plaintiff be terminated effective August 31, 2013. (Defs.' 56.1 Stmt. ¶ 39.) Plaintiff alleges that Dr. Schiavone failed to follow SBUH's rules for grievances and due process insofar as he formed the ad-hoc committee "without providing his written notice to uphold the Program Director's decision to terminate the Plaintiff"; however, Plaintiff concedes that Dr. Schivone rendered a final decision indicating that he concurred with the committee's recommendation. (Pl.'s 56.1 Counterstmt. ¶ 39.) Plaintiff was terminated from the SBUH Med Peds Program effective August 31, 2013. (Pl.'s 56.1 Stmt. ¶ 25.) In her Final Evaluation Form, Plaintiff received an overall performance rating of unsatisfactory. (Pl.'s 56.1 Stmt. ¶ 26.)

Plaintiff received unemployment insurance benefits following her termination. (Pl.'s 56.1 Stmt. ¶ 27.) Plaintiff alleges that since she was terminated by SBUH, she "has been unable to resume and/or complete residency training in Internal Medicine/Pediatrics Program and/or any other specialty." (Pl.'s 56.1 Stmt. ¶ 32.) Defendants allege that Plaintiff has worked as a disabilities services consultant, performed clinical research,

and obtained a master's degree in public health.  (Defs.' 56.1 Counterstmt. ¶ 32.)

V.   Dr. Fenton's 2014 Evaluation

Plaintiff alleges that on or about April 21, 2014, Dr. Fenton submitted an "adverse evaluation" of Plaintiff to the American Board of Pediatrics ("ABP") and "recommended that the Plaintiff receive an evaluation rating of 'Unsatisfactory' for Professional Evaluation and 'Marginal' for Clinical Evaluation." (Pl.'s 56.1 Stmt. ¶ 28.)  A resident physician who receives an unsatisfactory performance rating in "ACGME Core Competency of: Professionalism/Professional Evaluation" is not eligible to receive credit for work or training completed during the academic period.  (Pl.'s 56.1 Stmt. ¶ 29.)

VI.  EEOC Complaints

Defendants allege that Plaintiff filed two intake questionnaire forms with the Equal Employment Opportunity Commission ("EEOC"), which were treated as charges; however, Plaintiff alleges that she is "uncertain" whether her first EEOC questionnaire form was treated as an EEOC charge.  (Pl.'s Counterstmt. ¶ 4.)  Plaintiff's first EEOC charge was signed on May 17, 2013, and received by the EEOC on May 23, 2013 (the "2013 EEOC Complaint").  (Defs.' 56.1 Stmt. ¶ 6; see also 2013 EEOC Compl.)  On November 20, 2013, the EEOC issued a Dismissal and Notice of Rights.  (Defs.' 56.1 Stmt. ¶ 10.)  Plaintiff alleges

that she was not informed of her right to sue until ten months later when she inquired about the status of the investigation, and the EEOC e-mailed her its Notice of Dismissal and Notice of Rights to Sue in March 2014. (Pl.'s 56.1 Counterstmt. ¶ 10.)

Plaintiff signed a second EEOC charge on October 15, 2014, which was received by the EEOC on October 21, 2014 (the "2014 EEOC Complaint"). (Defs.' 56.1 Stmt. ¶ 12; see also 2014 EEOC Compl.) Plaintiff alleges that she faxed the 2014 EEOC Complaint to the EEOC on October 17, 2014, and the EEOC stamped that it received the complaint on October 21, 2014. (Pl.'s 56.1 Counterstmt. ¶ 12.) On December 15, 2014, the EEOC issued a Dismissal and Notice of Rights. (Defs.' 56.1 Stmt. ¶ 15.)

Defendants allege that the EEOC provided SBUH with notices dated June 13, 2013, and November 4, 2014, and did not provide the full content of Plaintiff's charges. (Defs.' 56.1 Counterstmt. ¶ 17.) Defendants further allege that Dr. Fenton was not aware that Plaintiff filed the 2013 EEOC Complaint until the end of July 2013, and she was not aware that Plaintiff filed the 2014 EEOC Complaint until June 2016. (Defs.' 56.1 Counterstmt. ¶ 17.) Plaintiff alleges that on or about July 3, 2013, SBUH staff was informed about the EEOC Complaint and asked to preserve evidence. (Pl.'s 56.1 Counterstmt. ¶ 48.)

VII. <u>NYS Physician's Board Complaint</u>

On May 5, 2013, Plaintiff's father submitted a complaint to the New York State Physician's Board (the "NYSPB Complaint"). (NYSPB Compl.)  The NYSPB Complaint states that individuals at SBUH "bullied, harassed, intimidated, discriminated, and defamed [Plaintiff]," and Dr. Fenton "reportedly as per the recommendations of the Internal Medicine/Pediatrics Residency Review Committee for the purpose of discrediting and continued bullying, intimidation, harassment and abasement of [Plaintiff] issued a letter of probation and demoted [Plaintiff] from a supervisory position without investigation or opportunity to respond to allegations made against [her]."  (NYSPB Compl.)  Plaintiff alleges that on or about June 13, 2013, the Physician's Board completed their investigation of her complaint.  (Pl.'s 56.1 Stmt. ¶ 16.)  Defendants allege that the Physician's Board advised Plaintiff that it could not assist her because "the alleged actions reported did not occur within the context of provision of medical care."  (Defs.' 56.1 Counterstmt. ¶ 16.)  Dr. Fenton testified that she was not informed of any Physician's Board investigation until 2016.  (Defs.' 56.1 Counterstmt. ¶ 16; Fenton's Dep. Tr. 98:10-99:16.)

DISCUSSION

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."
FED. R. CIV. P. 56(a). A genuine factual issue exists where "the
evidence is such that a reasonable jury could return a verdict for
the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986). In
determining whether an award of summary judgment is appropriate,
the Court considers the pleadings, deposition testimony,
interrogatory responses, and admissions on file, together with
other firsthand information that includes but is not limited to
affidavits. Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

       The movant bears the burden of establishing that there
are no genuine issues of material fact. Gallo v. Prudential
Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). Once
the movant makes such a showing, the non-movant must proffer
specific facts demonstrating "a genuine issue for trial." Giglio
v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at
*4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation
omitted). Conclusory allegations or denials will not defeat
summary judgment. Id. However, in reviewing the summary judgment
record, "'the court is required to resolve all ambiguities and
draw all permissible factual inferences in favor of the party
against whom summary judgment is sought.'" Sheet Metal Workers'
Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL

6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

On a motion for summary judgment, the Court must liberally construe a pro se litigant's complaint and "read a pro se litigant's supporting papers liberally, interpreting them to raise the strongest arguments that they suggest." Adeyi v. U.S., No. 06-CV-3842, 2010 WL 520544, at *3 (E.D.N.Y. Feb. 8, 2010) (internal quotation marks and citations omitted). Nevertheless, a litigant's pro se status does not excuse him from the general requirements of summary judgment and "bald assertion[s] unsupported by evidence" will not suffice to overcome summary judgment. Id. (internal quotation marks and citations omitted).

The Second Circuit has expressed "the need for caution in awarding summary judgment to the defendant in an employment discrimination case where, as here, the merits turn on a dispute as to the employer's intent." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (internal quotation marks and citation omitted). Nevertheless, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Westbrook v. City of N.Y., 591 F. Supp. 2d 207, 222 (E.D.N.Y. 2008) (internal quotation marks and citations omitted).

I.    Title VII Claim

        The Complaint does not specify whether Plaintiff's Title
VII retaliation claim is asserted against both Defendants.
However, to the extent the Complaint asserts a Title VII claim
against Dr. Fenton, the Court GRANTS summary judgment in favor of
Defendants since individuals are not subject to Title VII
liability.  See Patterson v. Cty. of Oneida, 375 F.3d 206, 221 (2d
Cir. 2004).  The Court will address the viability of Plaintiff's
Title VII claim against SBUH.

    A.    Administrative Exhaustion

        Prior to filing a Title VII retaliation claim, the
plaintiff must timely file a charge with the EEOC within 300 days
of the retaliatory act.  Valtchev v. City of N.Y., 400 F. App'x
586, 588 (2d Cir. 2010).  "Failure to timely file a charge with
the EEOC renders a Title VII claim time-barred, thereby preventing
a claimant from bringing her claim in federal court."  Fanelli v.
New York, 51 F. Supp. 3d 219, 227 (E.D.N.Y. 2014).  This exhaustion
requirement applies to both underlying factual allegations and
causes of action.  Id.

        However, the continuing violation doctrine provides an
exception "for claims that the discriminatory acts were part of a
continuing policy and practice of prohibited discrimination so
long as one act of discrimination in furtherance of the ongoing
policy occurred within the limitations period."  Id. (internal

16

quotation marks and citations omitted). Nevertheless, this doctrine "does not apply to discrete acts of discrimination, even if they are related to acts alleged in timely filed charges." Blair v. L.I. Child and Family Dev. Servs., Inc., No. 16-CV-1591, 2017 WL 722112, at *9 (E.D.N.Y. Jan. 31, 2017), report and recommendation adopted, 2017 WL 728231 (E.D.N.Y. Feb. 21, 2017) (internal quotation marks and citation omitted). Termination is a "discrete act[]" that is "barred if not timely filed." Valtchev, 400 F. App'x at 589. Further, courts in this Circuit have held that "disciplinary actions against employees and negative employee evaluations are discrete acts that do not constitute a continuing violation." Olivier v. Cty. of Rockland, No. 15-CV-8337, 2017 WL 934711, at *5 (S.D.N.Y. Mar. 8, 2017) (collecting cases).

Additionally, the plaintiff must commence her Title VII action within ninety days of receipt of a right to sue letter from the EEOC. Vlad-Berindan v. LifeWorx, Inc., No. 13-CV-1562, 2014 WL 1682059, at *5 (E.D.N.Y. Apr. 28, 2014), aff'd, 599 F. App'x 415 (2d Cir. 2015). This ninety-day period is a statute of limitations that is subject to equitable tolling in "'rare and exceptional circumstances such as when a party is prevented in some extraordinary way from exercising his rights.'" Id. (quoting Cherry v. City of N.Y., 381 F. App'x 57, 58-59 (2d Cir. 2010). The plaintiff bears the burden of demonstrating that "exceptional circumstances" prevented her from filing the discrimination

charge, and the district court must analyze whether the plaintiff "(1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved the circumstances are so extraordinary that the doctrine should apply." Young v. Lord & Taylor, LLC, 937 F. Supp. 2d 346, 351 (E.D.N.Y. Mar. 21, 2013) (internal quotation marks and citation omitted).

Here, Plaintiff filed two EEOC complaints: (1) an EEOC intake questionnaire dated May 17, 2013, and received by the EEOC on May 23, 2013 (the "2013 EEOC Complaint"), and (2) an EEOC intake questionnaire dated October 17, 2014, and received by the EEOC on October 21, 2014 (the "2014 EEOC Complaint"). (See 2013 EEOC Compl.; 2014 EEOC Compl.) The 2013 EEOC Complaint cites two discriminatory actions: (1) on May 2, 2013, Plaintiff was "placed on probation and demoted of supervisory role and relinquished educational grant obtained," and (2) from "2/08-10/13[6] . . . superstorm use as the basis of unprofessional behavior." (2013 EEOC Compl. at P:5-917.) On June 27, 2013, Plaintiff submitted a memorandum to the EEOC that referenced her failure to receive a promotion to supervisory status from May 2012 to March 2013, her placement on probation in May 2013, and her termination on June 20, 2013. (EEOC Memo.)

---

[6] It is unclear whether Plaintiff is referring to a time period from February 2008 through October 2013, or whether she is referencing a time period from February 8, 2013 through February 10, 2013. As Plaintiff began her residency at SBUH in 2011, the Court assumes the latter time period applies.

The EEOC issued a Notice of Right to Sue with respect to the 2013 EEOC Complaint on November 20, 2013 (the "Right to Sue Letter"). (2013 Right to Sue Ltr.) Plaintiff alleges that she did not receive the Right to Sue Letter until March 19, 2014. (Pl.'s 56.1 Counterstmt. ¶¶ 10-11.) Even crediting Plaintiff's allegation, she was required to commence her Title VII action within ninety days of her receipt of the Right to Sue Letter-- June 17, 2014. See Vlad-Berindan, 2014 WL 1682059, at *5. However, Plaintiff did not commence this action until approximately nine months later--March 14, 2015. Moreover, Plaintiff has not alleged that "exceptional circumstances" inhibited her ability to timely file a Title VII action. See Young, 937 F. Supp. 2d at 351. Thus, any Title VII claims based on the factual allegations set forth in the 2013 EEOC Complaint are time barred.

The 2014 EEOC Complaint alleges that SBUH retaliated against Plaintiff and references the following incidents: (1) the ABP's April 21, 2014, letter indicating that Plaintiff will not receive full credit for certain training; (2) the negative reference provided by Dr. Fenton in either July or August 2013;[7] (3) Plaintiff's August 2013 termination; and (4) the "biased

---

[7] The October 2014 EEOC Complaint states that Dr. Fenton provided the negative reference in August 2013; however, Plaintiff's letter dated October 15, 2014, states that Dr. Fenton provided the negative reference in July 2013. (2014 EEOC Compl; Oct. 2014 EEOC Ltr.)

hearing" conducted in July 2013. (2014 EEOC Compl. at P:5-900, P:5-903.) However, with the exception of the April 21, 2014 ABP Letter, the incidents set forth in the 2014 EEOC Complaint occurred more than 300 days before the filing of Plaintiff's complaint.[8]

Plaintiff appears to argue that the continuing violation doctrine applies. (Pl.'s Opp. Br. at 14.) However, Plaintiff's negative reference, termination, and hearing all constitute discrete acts that cannot comprise a continuing policy or practice. As previously noted, termination is a discrete act. See Valtchev, 400 F. App'x at 589. The hearing referenced in Plaintiff's 2014 EEOC Complaint was conducted in connection with Plaintiff's appeal of her termination, (see Defs.' 56.1 Stmt. ¶ 39; Pl.'s 56.1 Counterstmt. ¶ 39), and the Court similarly finds it to be a discrete act. The Court also concludes that Dr. Fenton's negative reference constitutes a discrete act. See Amar v. Hillcrest Jewish Ctr., No. 05-CV-3290, 2009 WL 891795, at *6 n.8 (E.D.N.Y. Mar. 31, 2009) ("[a]t least one court has held that a negative employment reference is a discrete occurrence, actionable at the time that it was provided to the potential employer, and not saved from the 300-day filing requirement under the so-called 'continuing violation doctrine'"). Parenthetically, at the time Dr. Fenton provided the negative reference, "the discriminatory character of

---

[8] As Plaintiff's 2014 EEOC Complaint was filed on October 17, 2014, any incidents that occurred prior to December 21, 2013, are time barred.

[that] act[ ] was undoubtedly apparent to Plaintiff." Olivier,
2017 WL 934711, at *6 (internal quotation marks and citation
omitted). Thus, the sole conduct to be considered in connection
with Plaintiff's Title VII claim is the April 21, 2014 ABP Letter.

B.   Merits

Title VII retaliation claims are analyzed under the
burden-shifting framework detailed in McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).
Setelius v. Nat'l Grid Elec. Servs. LLC, No. 11-CV-5528, 2014 WL
4773975, at *19 (E.D.N.Y. Sept. 24, 2014). First, the plaintiff
must set forth a prima facie retaliation claim by demonstrating:
"(1) she engaged in a protected activity; (2) the employer was
aware of this activity; (3) the employee suffered a materially
adverse employment action; and (4) there was a causal connection
between the alleged adverse action and the protected activity."
Id. Once the plaintiff makes a prima facie showing, the defendant
must proffer a "legitimate, nondiscriminatory reason for the
action that the plaintiff alleges was retaliatory." Id. (internal
quotation marks and citation omitted). If the defendant presents
such a reason, the plaintiff must establish that "but for the
protected activity, she would not have been terminated." Id.
(emphasis in original; citing Univ. of Tex. Sw. Med. Ctr. v.
Nassar, --- U.S. ----, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503
(2013)).

21

A.    Protected Activity

        Plaintiff alleges that she engaged in protected activity when she submitted complaints to the EEOC and New York State Physician's Board in May 2013.  (Pl.'s Br. at 11.)  Defendants do not dispute that Plaintiff's EEOC complaints constitutes a protected activity.  However, Defendants argue that the New York State Physician's Board complaint ("NYSPB Complaint") does not constitute protected conduct that SBUH was aware of because it did not oppose Title VII discrimination.  (Defs.' Opp. Br. at 10-11.) The Court agrees.

        "[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood that the plaintiff's opposition was directed at conduct prohibited by Title VII."  Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 15 (2d Cir. 2013) (internal quotation marks and citation omitted).  Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin."  42 U.S.C. 2000e-2(a)(2).

        Here, the NYPB Complaint contains the word "discrimination," but does not contain any allegations indicating that the complained of "discrimination" was based on race, color,

religion, sex, or national origin.  Accordingly, the NYPB Complaint does not constitute a protected activity.  See Boata v. Pfizer, Inc., No. 10-CV-4390, 2013 WL 432585, at *6 (S.D.N.Y. Jan. 31, 2013), aff'd, 554 F. App'x 73 (2d Cir. 2014) ("the law is well-established that, without more, the mere use of the word 'discrimination' does not transform a single email into protected activity"); Boakye-Yiadom v. Laria, No. 09-CV-0622, 2012 WL 5866186, at *12 (E.D.N.Y. Nov. 19, 2012) ("the fact that the July 15 Memo contained the words illegal and discriminatory are not enough to constitute protected activity") (internal quotation marks and citation omitted).  Thus, Plaintiff's sole protected activities are her EEOC complaints.

B.  Causation

As set forth above, SBUH received notice of the 2013 EEOC Complaint on or about June 13, 2013, (see 2013 Notice of Charge), and the record contains a letter from the ABP dated April 21, 2014, stating that SBUH recorded an adverse evaluation of Plaintiff's performance (the "ABP Letter"), (ABP Ltr.).  The ABP Letter contains a chart indicating that Plaintiff received an unsatisfactory professional evaluation for the time period from July 1, 2012 through June 30, 2013, which was attributed "0" credits.  (ABP Ltr.)  The record does not contain any direct evidence that SBUH's adverse evaluation of Plaintiff's performance--and the resulting attribution of no credit for the

July 2012-June 2013 time period--was retaliation for Plaintiff's filing of the 2013 EEOC Complaint.

"In order for a court to accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case, the temporal proximity must be very close." Varno v. Jefferson Cty. Dep't of Planning, No. 11-CV-0803, 2015 WL 5602965, at *8 (N.D.N.Y. Sept. 23, 2015), aff'd sub. nom. Varno v. Canfield, 664 F. App'x 63 (2d Cir. 2016) (internal quotation marks and citation omitted). While the Second Circuit has not "define[d] the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," courts in this Circuit have held that a two to three month gap between the protected activity and adverse employment action is too removed to support an inference of causation. Maxton v. Underwriter Labs, Inc., 4 F. Supp. 3d 534, 547 (E.D.N.Y. 2014) (internal quotation marks and citation omitted). But see Gorzynski, 596 F.3d at 110 ("we have previously held that five months is not too long to find the causal relationship"). The Court finds that the approximately ten-month gap between SBUH's receipt of the EEOC's notice of charge and the ABP Letter is too remote to establish causation based on temporal proximity. See, e.g., Maxton, 4 F. Supp. 3d at 547 (holding that the plaintiff did not state a prima facie retaliation claim where, inter alia, there

was an eleven-month gap between the protected activity and adverse employment action); Lamphear v. Potter, No. 09-CV-1640, 2012 WL 3043108, at *7 (D. Conn. Jul. 25, 2012) (holding that a temporal gap of nine to ten months was "too attenuated in time to maintain a claim for [Title VII] retaliation").

The Court acknowledges that temporal proximity is only one factor in its causation analysis, and the plaintiff may establish a causal connection by demonstrating "a 'pattern of antagonism' over the intervening period" between the protected activity and the alleged adverse action. Curcio v. Roosevelt Union Free Sch. Dist., No. 10-CV-5612, 2012 WL 3646935, at *14 (E.D.N.Y. Aug. 22, 2012) (internal quotation marks and citations omitted). In June 2013, Plaintiff was placed on restricted responsibilities, given a negative evaluation, and provided notice of her termination, and in August 2013, her appeal of her termination was denied. (Pl.'s 56.1 Stmt. ¶¶ 18-19; Defs.' 56.1 Stmt. ¶¶ 33, 39.) However, Plaintiff has not alleged that incidents supporting a "pattern of antagonism" took place between August 2013 and the April 2014 ABP Letter. Moreover, the ABP Letter indicates that SBUH did recommend that Plaintiff receive credit for the period from July 1, 2013, through August 31, 2013. (ABP Ltr.)

The Court also acknowledges that while the ABP issued its letter in April 2014, the record appears to indicate that SBUH issued the adverse evaluation that resulted in Plaintiff's

recommended loss of credits in or about June or July 2013. The Termination Letter dated June 20, 2013, states, in relevant part, that the Medicine Pediatrics Review Committee recommended Plaintiff be given a rating of unsatisfactory and repeat a year of training, and as a result, Plaintiff "will not receive credit for the 2012-2013 academic year by the [ABP] and the American Board of Internal Medicine." (Termination Ltr.) Additionally, Dr. Kimberly Kranz prepared an evaluation stating that the faculty evaluated Plaintiff's competency and determined that she performed below expected level in a number of areas and did not meet supervisory qualifications. (Kranz Eval.) Dr. Kranz updated this evaluation on June 17, 2013, and submitted it on July 1, 2013. (Kranz Eval. at P:5-19.)

However, were the Court to consider the adverse action to be SBUH's adverse evaluation, rather than the ABP letter, the operative date of the adverse action would be July 2013 at the latest, and Plaintiff's claim would be administratively barred based on her failure to file an EEOC charge within 300 days.[9] See Olivier, 2017 WL 934711, at *5 (negative evaluations are discrete acts that do not qualify as continuing violations).

Accordingly, the Court finds that Plaintiff has failed to state a prima facie case and her Title VII claim is DISMISSED.

_____

[9] 300 days after July 1, 2013, is April 1, 2014. As previously noted, Plaintiff's 2014 EEOC Complaint was filed in October 2014.

II.  Section 1981 Claim

The Court construes the Complaint as asserting Section 1981 claims against SBUH and Dr. Fenton in her individual capacity, as neither the caption nor the substance of the Complaint indicate that Plaintiff is suing Dr. Fenton in her official capacity.  The Court will address each Defendant in turn.

A.  SBUH

Defendants argue that Plaintiff's Section 1981 claim against SBUH is barred pursuant to the doctrine of sovereign immunity and the Eleventh Amendment.  (Defs.' Opp. Br. at 7.)  The Court agrees.

"The Eleventh Amendment . . . bars a private suit against a state in federal court unless the state consents to being sued or Congress unequivocally express[es] its intent to abrogate the state's sovereign immunity through legislation enacted pursuant to a valid grant of constitutional authority."  Ideyi v. State Univ. of N.Y. Downstate Med. Ctr., No. 09-CV-1490, 2010 WL 3938411, at *3 (E.D.N.Y. Sept. 30, 2010) (internal quotation marks and citation omitted; second alteration in original).  Eleventh Amendment immunity extends to "state agents and state instrumentalities that are, effectively, arms of the state . . . covering as well officials at state agencies working on behalf of the state (i.e., in their official capacities)."  Id. (internal quotation marks and citation omitted).  Courts in this Circuit have held that SUNY

Stonybrook qualifies as one of the "state agent[s] and state instrumentalities to which Eleventh Amendment immunity applies." Gomez v. Stonybrook University, No. 14-CV-7219, 2016 WL 1039539, at *13 (E.D.N.Y. Jan. 28, 2016), report and recommendation adopted, 2016 WL 1045536 (E.D.N.Y. Mar. 15, 2016) (internal quotation marks and citation omitted). See also Ideyi, 2010 WL 3938411, at *4 ("SUNY (including its subdivisions) and its officials are entitled to the protection of sovereign immunity").

Accordingly, as Congress has not abrogated New York's immunity from Section 1981 claims, Jennings v. Suny Health Science Center at Brooklyn (Downstate Medical Center), 201 F. Supp. 3d 332, 335 (E.D.N.Y. 2016), Plaintiff's Section 1981 claim against SBUH is DISMISSED.[10]

B.  Dr. Fenton

As set forth above, Plaintiff has expressly represented that she is asserting a Section 1981 claim and is not asserting a Section 1983 claim. (Pl.'s Opp. Br. at 7.) Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to full and equal benefits of all laws and proceedings for the security of persons and property as is

---

[10] Parenthetically, even if the Court were to construe Plaintiff's claim against SBUH as asserted under Section 1983, it would similarly be barred based on sovereign immunity. Mamot v. Bd. of Regents, 367 F. App'x 191, 192 (2d Cir. 2010) ("[i]t is well-established that New York has not consented to § 1983 suits in federal court").

enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."  42 U.S.C. § 1981(a).  However, "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units."  Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733, 109 S. Ct. 2702, 2722, 105 L. Ed. 2d 598 (1989) (emphasis added).  Additionally, this principle has been "'extend[ed] to actions against individual defendants in their individual capacities.'"[11]  Ideyi, 2010 WL 3938411, at *5 (quoting Rehman v. State Univ. of N.Y., 596 F. Supp. 2d 643, 654 (E.D.N.Y. 2009)).  See also Romero v. City of N.Y., No. 16-CV-4157, 2016 WL 6155935, at *3 (E.D.N.Y. Oct. 21, 2016) (the unification of Section 1981 and Section 1983 claims "encompass not only governmental entities but also individuals sued in their individual capacities who are state actors") (internal quotation marks and citation omitted).  In light of Plaintiff's pro se status, the Court will liberally construe Plaintiff's Section 1981 retaliation claim

---

[11] While the Second Circuit has not yet resolved whether Section 1981(c), which was introduced as part of the Civil Rights Act of 1991, essentially overrules the Supreme Court's holding in Jett, in the absence of additional guidance, courts in this Circuit have continued to follow Jett.  Westbrook, 591 F. Supp. 2d at 223, n.8.  Accord Li-Wei Kao v. Erie Comm. Coll., No. 11-CV-415S, 2015 WL 3823719, at *22, n.7 (W.D.N.Y. Jun. 19, 2015).  See also 42 U.S.C. § 1981(c) ("The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of state law.").

against Dr. Fenton in her individual capacity as asserted pursuant to Section 1983.

Section 1983 provides for an action against a "'person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" Patterson, 375 F.3d at 225 (quoting 42 U.S.C. § 1983). "Section 1983 is not itself a source of substantive rights . . . [it] merely provides a method for vindicating federal rights elsewhere conferred . . . such as those conferred by § 1981." Id. (internal quotation marks and citations omitted). In order to assert a claim under Section 1983, the plaintiff must allege the following: "(1) the violation of a right secured by the constitution and laws of the United States, and (2) the alleged deprivation was committed by a person acting under color of state law." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 87-88 (2d Cir. 2015) (internal quotation marks and citation omitted). State employment is generally sufficient for the defendant to be considered a state actor. Rehman, 596 F. Supp. 2d at 654.

Defendants have construed the Complaint as asserting a Section 1983 claim based on First Amendment retaliation. (Defs.' Br. at 16-17.) However, the Court finds that the Complaint is more properly construed as asserting a Section 1983 Equal

Protection claim for retaliation after a complaint of discrimination. See Vega, 801 F.3d at 91 ("a claim of retaliation for a complaint of alleged discrimination is actionable under § 1983" as a violation of the Equal Protection Clause).

The elements of a Section 1983 retaliation claim based on a violation of the Equal Protection Clause mirror the elements of a Title VII retaliation claim and are analyzed using the McDonnell Douglas framework. Goodwine v. City of N.Y., No. 15-CV-2868, 2016 WL 3017398, at *5 (S.D.N.Y. May 23, 2016); Deuel v. Town of Southampton, No. 14-CV-2668, 2015 WL 4394085, at *8 (E.D.N.Y. Jul 16, 2015). However, to demonstrate individual liability under Section 1983, "plaintiff must show that each individual was personal[ly] involve[d] in the retaliation and acted with discriminatory purpose." Edwards v. Khalil, No. 12-CV-8442, 2016 WL 1312149, at *28 (S.D.N.Y. Mar. 31, 2016) (internal quotation marks and citation omitted; alterations in original).

Additionally, Section 1983 claims are subject to a three-year statute of limitations and need not be asserted within the 300-day period applicable to Title VII claims. Patterson, 375 F.3d at 225. Accordingly, the Court will consider any conduct that occurred after March 14, 2012, in determining Plaintiff's Section 1983 claim.

A.   Protected Activity

As set forth above, Plaintiff engaged in protected activity by filing her EEOC Complaints, but did not engage in a protected activity when she filed her NYPB Complaint. Thus, Plaintiff's two protected activities are the filing of her 2013 EEOC Complaint on May 17, 2013, and her 2014 EEOC Complaint on October 17, 2014. (See 2013 EEOC Compl.; 2014 EEOC Compl.)

B.   Knowledge

Defendants allege that the EEOC provided SBUH with notices dated June 13, 2013, and November 4, 2014, that indicated it had received Plaintiff's charges. (Defs.' 56.1 Counterstmt. ¶ 17.)  As "general corporate knowledge" suffices to demonstrate knowledge of Plaintiff's protected activity, Plaintiff has satisfied the second prong of her prima facie case.  Goodwine, 2016 WL 3017398, at *6 (internal quotation marks and citation omitted).

C.   Adverse Employment Actions

The Court liberally construes Plaintiff's opposition as asserting that Dr. Fenton retaliated against her by: (1) terminating her, (2) failing to provide a letter of reference in connection with her October 2013 residency application, (3) submitting the previously noted adverse evaluation to the ABP, and (4) submitting a negative reference in October 2014 in connection with Plaintiff's application for a medical license in

the State of Maryland.  (Pl.'s Br. at 16, 25; Pl.'s Opp. Br. at 14-16.)  The Court finds that these incidents constitute adverse actions, as they "'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  Vega, 801 F.3d at 90 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)).

As set forth above, Section 1983 liability requires that Plaintiff demonstrate Dr. Fenton's personal involvement in the alleged retaliation.  Defendants do not dispute that Dr. Fenton was personally involved in Plaintiff's termination or the adverse evaluation referenced in the ABP Letter.  Indeed, Dr. Fenton's involvement in those actions is clear given her signature on Plaintiff's Termination Letter and the Termination Letter's reference to the fact that Plaintiff would not receive ABP credit for the 2012-2013 academic year.  (Termination Ltr.)  Similarly, with respect to the negative reference allegedly provided by Dr. Fenton in October 2014, the record contains a form entitled "Maryland Board of Physicians Verification of Postgraduate Medical Education" with an explanation letter signed by Dr. Hossain and Dr. Fenton, as well as a letter dated October 8, 2014, that was also signed by Drs. Hossain and Fenton.  (Maryland Ver. Form; Oct. 2014 Ltr.)

However, the record does not support Dr. Fenton's personal involvement in SBUH's alleged failure to provide

33

Plaintiff with a letter of reference in connection with her 2013 application. In support, Plaintiff cites an email exchange with Alexander Djuricich, who appears to be affiliated with another medical residency program. (Djuricich Emails.) Mr. Djuricich states, in relevant part, "[i]n re-reviewing your file, I noticed that neither of the Stony Brook program directors had written a letter of recommendation on your behalf. . . [m]y question is this: do I have permission to speak with either of the PDs there about your situation (specifically, Dr. Hossain and Dr. Fenton)? This information would greatly help our understanding of your application, in my opinion." (Djuricich Emails at P:5-1047.)

Plaintiff has not alleged that she requested a letter of reference from Dr. Fenton in 2013, or that Dr. Fenton was otherwise involved in a decision not to provide Plaintiff with such a letter. When questioned about Plaintiff's email exchange with Mr. Djuricich at her deposition, Dr. Fenton was only familiar with a letter of recommendation prepared in October 2014, and testified that "[w]hatever [Plaintiff] requested, we submitted it. If [Plaintiff] didn't request it, we didn't submit it." (Fenton's Dep. Tr. 139:2-141:21.)

The Court is not persuaded by Plaintiff's argument that "Defendants did not provide the Plaintiff a letter of reference (LOR) to accompany the Plaintiff's residency application, which Defendants knew and admitted is common practice." (Pl.'s Opp. Br.

at 6.)  As set forth above, while it may be common practice for medical programs to provide letters of reference, Plaintiff has not demonstrated that Dr. Fenton ignored such a request in 2013. Parenthetically, the notion that Dr. Fenton failed to provide a letter of reference is wholly inconsistent with Plaintiff's allegation in the 2014 EEOC Complaint that Dr. Fenton provided a negative reference in August 2013, and her allegation in an October 15, 2014, letter to the EEOC that Dr. Fenton provided a negative reference in July 2013.  (2014 EEOC Compl. at P:5-900; Oct. 2014 EEOC Ltr.)  Accordingly, the Court will not consider the alleged failure to provide Plaintiff with a letter of reference in 2013 based on the absence of any evidence regarding Dr. Fenton's personal involvement in that conduct.

D.  Causation

As set forth above, Plaintiff's remaining adverse actions are her termination, the recommendation to SBUH that she not receive credits as set forth in the ABP Letter, and the negative reference provided in October 2014.  The Court will address each adverse action in turn.

1.  Termination

While the close temporal proximity between SBUH's receipt of the EEOC's notice of charge on June 13, 2013, and the Termination Letter dated June 20, 2013, supports a causal connection, Defendants allege that Plaintiff cannot establish

causation because Dr. Fenton was not aware of the 2013 EEOC Complaint until late July 2013.

"[W]here it is undisputed that the decision maker was unaware of the employee's protected activity, that fact may be evidence that there is no causal connection." Ehrbar v. Forest Hills Hosp., 131 F. Supp. 3d 5, 34 (E.D.N.Y. 2015). But see Papelino v. Albany Coll. of Pharmacy of Union Univ., 633 F.3d 81, 92 (noting, in the context of a Title IX case, that "[w]hile the individual agents' claims of unawareness of the protected activity are relevant to the jury's determination of causality, a jury is entitled to disregard such claims if they are unreliable").

Defendants do not dispute that the EEOC sent SBUH a notice of Plaintiff's charge dated June 13, 2013. (Defs.' 56.1 Counterstmt. ¶ 17.) However, Dr. Fenton testified that she was not informed of any EEOC complaint until the end of July 2013 when SBUH's counsel, Ms. Lemoal-Gray, advised her by telephone. (Fenton's Dep. Tr. 97:6-98:9.) Plaintiff has not proffered any evidence that would refute Dr. Fenton's testimony regarding when she learned of the 2013 EEOC Complaint.

Additionally, the 2013 Notice of Charge is directed to the Director of Human Resources at SBUH. (2013 Notice of Charge.) It does not contain the substance of Plaintiff's complaint, and merely indicates that Plaintiff filed a charge of employment discrimination under Title VII based on race and sex and raised

the issues of "Demotion, Discipline, Other, Terms/Conditions," and states that "[n]o action is required by [SBUH] at this time." (2013 Notice of Charge.)  Most notably, the 2013 Notice of Charge does not state the names of any individuals named in Plaintiff's 2013 EEOC Complaint.

Plaintiff argues that "Defendants also lose[ ] sight that they entered into discovery an e-mail dated July 3, 2013 requesting preservation of evidence that referenced the Plaintiff's May 2013 EEOC charge number, approximately eight (8) weeks before the Plaintiff's effective termination date." (Pl.'s Opp. Br. at 24 (citing Blair Email).)  However, this email also post-dates the Termination Letter.  While Plaintiff notes that the email precedes her effective termination date, (Pl.'s Opp. Br. at 24), the operative question is whether Dr. Fenton was aware of the 2013 EEOC Complaint prior to issuing the Termination Letter.[12]

Moreover, the July 3, 2013, email was sent by Dr. Robyn Blair, Associate Professor of Clinical Pediatrics and Director of the Pediatric Residency Training Program and Resident Continuity Clinic, to Jean Segall, the Pediatric Residency Program Coordinator; Dr. Fenton was not a recipient or otherwise referenced

---

[12] Parenthetically, Plaintiff submitted her appeal of her termination to Dr. Schiavone, who convened an ad hoc committee to issue a recommendation. (Pl.'s 56.1 Counterstmt. ¶ 22; Defs.' 56.1 Stmt. ¶ 39.)  Plaintiff does not dispute that Dr. Schiavone issued the final decision on the committee's recommendation as Chair of the GMEC.  (Pl.'s 56.1 Counterstmt. ¶ 39.) Plaintiff has not alleged that Dr. Fenton was involved in the ad hoc committee or in the final determination of the GMEC.

in the email.  (Blair Email; Segall's Dep. Tr. at 10:6-9.)  The email, which is redacted below the signature line, merely states "FYI" and contains the following attachments: "Request for Docs Blair.pdf; Notice of Charge.pdf; Notice to Preserve (NB) 7-2-13.pdf."  (Blair Email.)  In short, the July 3, 2013, email from Dr. Blair to Ms. Segall does not establish that Dr. Fenton was aware of the 2013 EEOC Complaint at that time or, more importantly, that Dr. Fenton was aware of the 2013 EEOC Complaint prior to the Termination Letter.

Where a decision-maker is unaware of the protected activity, the plaintiff may still demonstrate causation by proffering evidence that the "decision-maker [who lacked knowledge] was acting on orders or encouragement of a superior who did have the requisite knowledge." Ehrbar, 131 F. Supp. 3d at 35 (internal quotation marks and citation omitted; alteration in original).  As set forth above, Plaintiff has failed to raise triable issues of fact as to whether any SBUH officials outside of the Human Resources Department were aware of the 2013 EEOC Complaint prior to the issuance of the Termination Letter. Plaintiff has also failed to adduce evidence that Dr. Fenton issued the Termination Letter at the urging of a superior who was aware of the 2013 EEOC Complaint.  Accordingly, Plaintiff has failed to satisfy her prima facie burden regarding causation.  See id. ("because Plaintiff does not dispute that the decision-makers were

wholly unaware of her protected activity and presents no facts permitting a reasonable jury to conclude that someone with knowledge of her protected activity directed or encouraged these unknowing decision-makers to terminate her, she has failed to satisfy even that minimal [prima facie] burden"); Setelius, 2014 WL 4773975, at *23-24 (holding that the plaintiff failed to establish causation at the prima facie stage where "there is no evidence that the decision-makers who investigated and ultimately terminated Plaintiff had actual knowledge of her complaint, acted with the encouragement of a superior with such knowledge, or at the behest of a subordinate with such knowledge").

2. Recommendation Regarding Academic Credit

As set forth more fully above, Plaintiff alleges that she suffered retaliation when "[o]n or about April 21st 2014, the Defendants recommended to [ABP] . . . that the Plaintiff should not receive credit for the training obtained during the July 2012 to June 2013 period." (Pl.'s Br. at 25.) Again it is unclear whether Plaintiff alleges that the adverse action is the ABP Letter notifying her that she would not receive credit or SBUH's earlier recommendation to the ABP that she not receive credit for the 2012-2013 academic year. To the extent the adverse action is the issuance of the ABP Letter in April 2014, Plaintiff fails to state a prima facie claim under Section 1983 for the same reasons

addressed in the Court's discussion of Plaintiff's Title VII claim based on the ABP Letter.

As to SBUH's recommendation that Plaintiff not receive full credit for her training, that recommendation dates back to the Termination Letter, which states that Plaintiff will receive a rating of unsatisfactory and will not receive ABP credit for the 2012-2013 academic year. (Termination Ltr.) As the Termination Letter dated June 20, 2013, predates Dr. Fenton's July 2013 knowledge of the 2013 EEOC Complaint, Plaintiff fails to state a prima facie retaliation claim for the same reasons addressed in the Court's discussion of her retaliation claim based on the Termination Letter.

### 3. Negative Letter of Reference

"To establish a retaliation claim based on a negative employment reference, a plaintiff must first prove that a 'false statement negatively affected [the plaintiff's] chances of securing employment.'" Alzawahra v. Albany Med. Ctr., 2012 WL 5386565, at *12 (N.D.N.Y. Nov. 1, 2012), aff'd, 546 F. App'x 54 (2d Cir. 2013) (quoting Abreu v. N.Y. City Police Dep't, 329 F. App'x 296, 298 (2d Cir. Mar. 31, 2009)) (emphasis and alteration in original). As previously noted, the record contains a form entitled "Maryland Board of Physicians Verification of Postgraduate Medical Education," which includes an explanation letter signed by Drs. Hossain and Fenton (the "Explanation

Letter"), as well as a letter dated October 8, 2014, addressed to "Program Director," and signed by Drs. Hossain and Fenton (the "Program Director Letter"). (Maryland Ver. Form; Oct. 2014 Ltr.) While Plaintiff has alleged that she has been "unable to resume and/or complete residency training in Internal Medicine/Pediatrics Program and/or any other specialty" after her termination from SBUH, (Pl.'s 56.1 Stmt. ¶ 32), she has not proffered evidence as to whether she was, or was not, awarded a license by the Maryland Board of Physicians. In the absence of evidence that Plaintiff did not receive her license, no reasonable juror could find that the Explanation Letter negatively affected her chances of securing licensure in Maryland.

As to the Program Director Letter, putting aside the question of whether this letter contains false statements, Plaintiff has not proffered any evidence as to which programs, if any, this letter was sent to, or how this letter negatively affected her job prospects. Indeed, while Plaintiff has alleged that she has been unable to resume residency training, she has not specifically cited this letter, nor has she elaborated on the circumstances surrounding it in discussing her alleged adverse actions. (See generally Pl.'s Br. at 25, Pl.'s Opp. Br. at 14-16.) Additionally, the Program Director Letter dated October 8, 2014, predates Plaintiff's 2014 EEOC Complaint and was prepared approximately sixteen (16) months after SBUH became aware of

Plaintiff's 2013 EEOC Complaint. Thus, the temporal gap between the protected activity and the Program Director Letter is far too attenuated to demonstrate a retaliation claim based on temporal proximity.

Accordingly, the Court finds that Plaintiff has failed to satisfy her prima facie burden and her Section 1983 claim against Dr. Fenton is DISMISSED.

CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Docket Entry 109) is GRANTED and Plaintiff's motion for summary judgment (Docket Entry 114) is DENIED. The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED. The Clerk of the Court is further directed to mail a copy of this Memorandum and Order to the pro se Plaintiff.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     August   10  , 2017
           Central Islip, New York